[No. B002491. Second Dist., Div. Five. Nov. 14, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSE ROCAEL VALLADARES, Defendant and Appellant.

**COUNSEL**

Frank O. Bell, Jr., State Public Defender, under appointment by the Court of Appeal, Monica Knox and Cheryl Lutz, Deputy State Public Defenders, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Susanne C. Wylie and Beverly K. Falk, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

FEINERMAN, P. J.—Following a jury trial, defendant, Jose Rocael Valladares, was convicted of robbery. (Pen. Code, § 211.) An allegation that he used a knife in the commission of the crime, within the meaning of Penal Code section 12022, subdivision (b), was found to be true. Probation was denied and he was sentenced to state prison for three years (the midterm), plus an additional one-year enhancement for the weapon use. Defendant was given credit for 194 days of presentence custody, but only 65 days of conduct credit were awarded. We conclude that the conduct credits were calculated improperly, but otherwise affirm the judgment.

At the preliminary hearing, defense counsel alleged that the charged offense was committed one day before defendant turned 18, that the court therefore lacked jurisdiction over him, and that the matter should be remanded to juvenile court. Defendant offered no proof of his age. The prosecutor stated that pursuant to *People* v. *Dudley* (1942) 53 Cal.App.2d 181 [127 P.2d 569], a person attains majority on the day before his 18th birthday. Defendant took no further steps to secure transfer of the matter to juvenile court and the matter proceeded to trial in superior court.

The victim of the robbery was an 11-year-old boy named Julius W. (Julius). He testified that he was walking home from school about 4 p.m., on February 17, 1983, with his friend Everett. Julius was carrying a trumpet in a black case. Two people approached him. One was defendant. Julius knew defendant by sight and knew that he lived in the neighborhood.[1] He did not know defendant's name. Defendant was wearing green pants and a red and white shirt. The person with defendant was smaller and wore blue pants and a red shirt. Defendant's companion asked Julius and Everett if they had any money. Neither did. Defendant placed one of his hands on the back of Julius' neck. Defendant's other hand held a knife. He placed the blade against the front of Julius' neck. Everett ran away. Defendant's companion asked Julius what was in the black carrying case. Julius told him it was a trumpet. The person told Julius to give him the trumpet. Julius handed him the case. The person opened it, looked inside, then closed it again. After that, defendant's companion searched Julius' pockets while defendant

---

[1]After the robbery, Julius learned that defendant lived in the apartment building next door to the one in which Julius lived.

continued to hold the knife to Julius' neck. When his companion finished searching Julius, defendant said, "Don't follow us or we'll kill you." Then he and his companion ran off with the trumpet. People's exhibit 1 looked like the knife defendant held to Julius' throat. It had the same type of curved blade.

Julius went directly home and called the sheriff's department. Within a half hour's time, sheriff's deputies arrived and commenced a search for the two suspects, based upon physical and clothing descriptions provided by Julius. Deputy Martin observed defendant in an alley behind his residence. When defendant saw Martin and another uniformed officer, he turned and fled across an open field. Martin called to defendant to stop, but defendant kept running through the field and down a driveway. Martin pursued him and found him hiding in an apartment doorway. Defendant was wearing green pants and a red and white shirt. Martin arrested defendant and took him back to a sheriff's patrol car which was parked in front of defendant's apartment. Julius, who was in his own apartment next door, heard them return and ran outside. He identified defendant as his assailant. People's exhibit 1, which Martin described as a box cutter, was found in defendant's pocket during a booking search.

Defendant testified in his own behalf. He claimed that he had the box cutter in his possession because he had been using it to fix some door hinges. His sister, with whom he lived, asked him to go to the store to buy some groceries. He absent-mindedly slipped the box cutter in his pocket and left for the store with his 17-year-old nephew. On the way, he saw Julius with a kid whom defendant knew as Padilla. Defendant saw Julius give Padilla something, but defendant did not know what it was. Defendant and his nephew continued on to the market. Defendant made his purchases and brought his groceries home. He arrived home about 2:50 p.m. He did not rob Julius. He fled when he saw the sheriff's deputies because he became "distracted."

On cross-examination, defendant was asked, without objection, if his sister were available to be in court if he wanted her there. He said that she was available, but he did not know if she was present. He was asked, also without objection, if he knew where his nephew resided. He responded affirmatively. When asked if his nephew could be in court if he wanted him there, he replied, "I don't know, because he works, and he doesn't have any days off." His nephew was not then in court.

After defendant completed his testimony, his counsel requested a continuance to the following day to enable him, with the aid of the court-appointed interpreter, to get in touch with defendant's sister, brother and father for

purposes of possibly having them testify. This continuance was granted. When proceedings resumed the following day, defense counsel advised the court that he had spoken with defendant's sister, that she had indicated that she would be of no value to defendant, and that counsel saw no reason to bring her to court.

Defense counsel asked for a further continuance of one or two days to enable him to attempt to locate and interview defendant's nephew. He advised the court that until that day he had been under the impression, from many conversations with defendant, that at the time of the offense, defendant had been in the company of a brother who had returned to Mexico. Despite the fact that defendant had testified the previous afternoon that it was a nephew, counsel had not become aware until a conversation with defendant on the present morning that defendant was talking about a nephew who resided in Los Angeles.[2] Counsel stated that if he found that the nephew would be a useful witness, he would bring him to court, and if not, he would rest his case. The motion for a further continuance was denied.

## CONTENTIONS ON APPEAL

On this appeal defendant contends:

1. The trial court lacked jurisdiction because he was a minor on the day of the crime;

2. The court abused its discretion when it refused to grant him a further continuance to secure attendance of his nephew;

3. The court miscalculated his custody credits.

## DISCUSSION

### Defendant's Age

■ Defendant alleges that he was born on February 18, 1965, that the crime was committed on February 17, 1983, that he was therefore only 17, and that the superior court lacked jurisdiction absent a juvenile court order certifying that he was unfit for juvenile court proceedings. Defendant concedes, as the prosecutor advised the magistrate when the issue was raised at the preliminary hearing, that pursuant to the statutory interpretation of

---

[2] Counsel also indicated a one-time belief that defendant had been with a cousin. It is unclear from the transcript whether this was a slip of counsel's tongue or a different version of the facts told to him by defendant.

Civil Code section 26 adopted in *People* v. *Dudley, supra,* 53 Cal.App.2d 181, and consistent with the rule at common law, a person attains majority on the day prior to his 18th birthday. Defendant argues, however, that *Dudley* was wrongly decided.

*Dudley* has been the law of this state for 42 years. The Legislature having failed in all those years to alter Civil Code section 26, we can safely assume that *People* v. *Dudley* correctly interprets the legislative intent.

Furthermore, right or wrong, the decision in *People* v. *Dudley* was binding on the trial court. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) If it was defendant's intention to seek appellate reevaluation of that rule, it was incumbent upon him to do so prior to trial. (Cf. *People* v. *Chi Ko Wong* (1976) 18 Cal.3d 698, 707 [135 Cal.Rptr. 392, 557 P.2d 976].) Defense counsel questioned defendant at trial about his date of birth. He did so for the purpose of establishing that there was no great discrepancy between defendant's age and that of the victim. He did not challenge the jurisdiction of the superior court based on defendant's age in either the superior court or via an extraordinary writ petition to this court.

Moreover, having waited to this late date to reassert his challenge to *People* v. *Dudley, supra,* 53 Cal.App.2d 181, defendant presents us with a record which casts serious doubt on the veracity of his claimed date of birth. He has requested us to take judicial notice of a purported birth certificate which we have declined to do, partially because it was not presented to the magistrate at the preliminary hearing, but more importantly because he presents no evidence that the certificate is his.

He testified at trial that he was born in Mexico, a fact confirmed by the probation report, yet the certificate is from Guatemala. Also, the probation report, which lists his birth date as February 18, 1963, indicates that defendant has a prior 1982 adult prosecution. We conclude that the superior court had jurisdiction to try defendant.

*Refusal of Further Continuance*

■ Defendant contends that it was reversible error for the court to refuse him a further continuance for purposes of enabling counsel to locate and interview defendant's nephew. ■ The parties agree that the decision to grant or deny a continuance must be exercised according to the following principles:

"The granting or denial of a motion for a continuance in the midst of a trial traditionally rests within the sound discretion of the trial judge who

must consider not only the benefit which the moving party anticipates but also the likelihood that such benefit will result, the burden on other witnesses, jurors and the court and, above all, whether substantial justice will be accomplished or defeated by a granting of the motion. In the lack of a showing of an abuse of discretion or of prejudice to the defendant, a denial of his motion for a continuance cannot result in a reversal of a judgment of conviction. (Citations.)" (*People* v. *Laursen* (1972) 8 Cal.3d 192, 204 [104 Cal.Rptr. 425, 501 P.2d 1145].)

■ "The granting of a continuance on the ground of the absence of a material witness is subject to certain well established conditions designed to prevent unwarranted delay in criminal prosecutions. These conditions are: '(1) a particular obtainable witness []; (2) materiality of the evidence []; (3) the necessity of his testimony []; and (4) diligence to obtain his attendance [].' (Witkin, Cal. Criminal Procedure (1963) p. 273.)" (*People* v. *Buckey* (1972) 23 Cal.App.3d 740, 744 [100 Cal.Rptr. 551].)

■ An analysis of the showing made by defendant below demonstrates that none of the requirements enumerated in *People* v. *Buckey, supra,* was satisfied. Counsel did not know if defendant's nephew was obtainable or if he had material evidence to present. If the nephew had been located and had corroborated defendant's story, his testimony would have been helpful to defendant, but it would only have been cumulative and as such not technically necessary. Most importantly, there was ample evidence from which the trial court could conclude that defendant had not been diligent in attempting to secure the witness' attendance.

Counsel attempted to blame his failure to learn earlier of the nephew's existence and relevance on the language barrier between himself and his Spanish-speaking client, and on defendant's failure to understand the significance of his nephew as a potential witness. Counsel admitted, however, that he used an interpreter whenever he spoke to defendant or to one of his relatives. Furthermore, defendant was not totally incapable of communicating in English. He spoke to his victim in English. The arresting officer testified that defendant answered booking questions in English without the aid of an interpreter. Defendant also addressed the bailiff in English in open court. The trial judge observed that judging from his testimony, defendant appeared to be an intelligent man. Given these considerations and the fact that it had already granted defendant one continuance for the purpose of securing corrobative witnesses and that defendant's sister had failed to corroborate his story, the trial court could well have concluded that defendant's testimony and his statements that day to counsel about his nephew were recent fabrications and that his request for a continuance was merely dilatory. Balancing the benefit which defendant purported to anticipate against

the likelihood that such benefit would result (*People* v. *Laursen, supra,* 8 Cal.3d 192), the trial court was well within its discretion in denying the continuance.

■ The continuance having properly been denied, there is no merit to defendant's additional argument that he was prejudiced by the prosecutor's reference in closing argument to defendant's failure to produce corroborating witnesses. The argument was proper in light of the questions on cross-examination about the availability of defendant's sister and nephew, questions to which no objection was raised.

■ We further note that if defendant's nephew in fact did exist, and was able to corroborate his story, defendant should have produced evidence of those facts at a motion for new trial. Although he made such a motion, defendant offered no such evidence and, in fact, did not cite the court's refusal to grant the further continuance as a basis for said motion.

### Computation of Conduct Credits

■ Defendant contends that because his presentence custody occurred after January 1, 1983, the effective date of Penal Code section 2933, he should, under the principles of *People* v. *Sage* (1980) 26 Cal.3d 498 [165 Cal.Rptr. 280, 611 P.2d 874], be given one day of conduct credit for each day he spent in presentence custody. We disagree.

Penal Code section 2933 provides that a state prison inmate may receive six months of worktime credit for every six months of full-time performance in a credit qualifying work, training or education program established by the Director of Corrections. Prisoners willing to participate in a full-time credit qualifying assignment, but who either are not assigned to such a program, or are assigned for less than full time, are to earn credits under the formula provided for by Penal Code section 2931, which is a four-month combined work and good behavior credit for each eight months served.

Defendant asserts that unless the State can demonstrate a compelling interest to justify different treatment of prison inmates and presentence detainees, it is a denial of equal protection to deny the detainees credits equal to those which prisoners earn under Penal Code section 2933. Recognizing that under the rule enunciated in *People* v. *Sage, supra,* defendants are currently awarded credits for presentence detention in an amount equal to those earned by prisoners under Penal Code section 2931, defendant further argues that Penal Code section 2933 is unconstitutional insofar as it denies maximum credits to those prisoners who are willing to work but who are not assigned to a full-time work program.

The Legislature determined in 1982 that "productive work on a regular basis is the most appropriate method of successfully instilling in prisoners the values of a law-abiding and cooperative society and will improve the possibility of their reintegration into that society." (Stats. 1982, ch. 1, § 1, p. 1.) In enacting Penal Code section 2933, the Legislature accorded equal stature to training and education programs which would provide prisoners with the basic tools which would enable them to perform productive work.

The only way that the benefits of the work, training and education programs can be realized is by successful full-time participation in such programs. Willingness to participate, without actual participation, while commendable, does not provide the same benefits to the prisoner or to society. Thus, the state has a compelling interest in limiting the maximum credits to those who do participate successfully in the designated programs. Absent a showing that the programs established by the Department of Corrections are implemented in an arbitrary manner so as to invidiously discriminate against a particular class of prisoners, the distinctions drawn by Penal Code section 2933 do not deny equal protection to those prisoners who are not assigned to the full-time credit programs. Furthermore, since the full-time programs are neither relevant nor available to presentence detainees, they are not the victims of unequal protection when they are limited to earning credits according to the formula provided in Penal Code section 2931. (*People* v. *Rosaia* (1984) 157 Cal.App.3d 832, 848 [203 Cal.Rptr. 856]; *People* v. *Davis* (1984) 154 Cal.App.3d 253 [201 Cal.Rptr. 422].)

Defendant correctly contends, however, that the trial court incorrectly computed the credits he should be awarded under the latter formula. The People agree. Having spent 194 days in presentence custody, defendant is entitled to 97 days of conduct credit.

The judgment is modified to provide that defendant is to receive 194 days of custody credits and 97 days of behavior credits, for a total of 291 days of credit. The superior court is directed to prepare an amended abstract of judgment to reflect the correct credits and to transmit a copy of the amended judgment to the Department of Corrections. In all other respects, the judgment is affirmed.

Ashby, J., and Hastings, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied January 24, 1985. Broussard, J., and Reynoso, J., were of the opinion that the petition should be granted.